UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
ROBERTO VELAZQUEZ,

                Petitioner,     07 Civ. 7228 (CM)(DFE)

    - against –         <u>REPORT AND RECOMMENDATION
                                  TO JUDGE McMAHON</u>
WILLIAM LAPE, Superintendent of
Coxsackie Correctional Facility, and
ANDREW CUOMO, Attorney General of
the State of New York,

                Respondents.
----------------------------------X

DOUGLAS F. EATON, United States Magistrate Judge.

     Represented by Frances Gallagher of the Legal Aid Society,
Roberto Velazquez brings this habeas corpus petition to challenge
his conviction after a suppression hearing before Justice Renee
White and a trial before Justice Deborah Cropper in Supreme
Court, New York County.  Velazquez did not testify at either
proceeding.  The jury found him guilty of one felony (Burglary in
the Second Degree) and three misdemeanors (Criminal Possession of
Stolen Property in the Fifth Degree).  Velazquez was a persistent
violent felony offender; Justice Cropper imposed concurrent
sentences:  16 years to life on the burglary count, and one-year
terms on the stolen property counts.

     Velazquez was represented by Jonathan Latimer during the
suppression hearing, trial and sentencing.  On appeal, Velazquez
was represented by Ms. Gallagher.  The Appellate Division
unanimously affirmed the conviction.  *People v. Velazquez*, 33
A.D.3d 352, 822 N.Y.S.2d 65 (1st Dept. Oct. 5, 2006), *leave
denied*, 7 N.Y.3d 929, 827 N.Y.S.2d 698 (Ct. App. Dec. 19, 2006).

     On August 14, 2007, Ms. Gallagher filed this habeas petition
in our Court, along with a 48-page Memorandum of Law.

     On February 6, 2008, Assistant Attorney General Ashlyn
Dannelly filed (a) a 23-page Memorandum of Law, (b) a Declaration
annexing the state-court briefs and decisions as Exhibits A
through F, and (c) the transcript of the state court proceedings.
(I shall refer to the transcript of the suppression hearing as
"H.," and the transcript of the trial as "Tr.".)

On March 14, 2008, Ms. Gallagher filed a 12-page Reply Memorandum.

The habeas petition presents only one ground:

Ground One:  The court violated petitioner's privilege against self-incrimination and his due process right to a fair trial when it permitted the State to introduce petitioner's statement at trial on the ground that it was a pedigree statement, when it was not and when it was made after petitioner had invoked his right to remain silent.

Velazquez's "statement" was introduced to the jury at Tr. 435-36:

> Q.  Detective, did there come a time during the arrest processing when you asked the defendant where he lived?
> A [by Detective Serrentino].  Yes.
> Q.  Did he tell you where he lived?
> A.  He told me that he rented a room along with his common-law - -
>          MR. LATIMER:  Objection, your Honor.
>          THE COURT:  Overruled.
> A.  He told me that he rented a room with his common-law wife, and that he lived on St. Ann's Avenue in the Bronx, and that was, I believe, 427 St. Ann's Avenue, in apartment 3B.
> Q.  Did he tell you who his common-law wife was?
> A.  Yes, he did.
> Q.  And who was that?
> A.  A woman by the name of Maria Andrades.

(Tr. 435-36.)  The Appellate Division ruled that (a) "the address question is unquestionably a proper and standard subject of pedigree inquiry," (b) there was "persuasive evidence that the question 'was not a disguised attempt at an investigatory interrogation,'" and (c) Velazquez's answers "fall outside the protections of Miranda v. Arizona, 384 U.S. 436 (1966)."

The Appellate Division cited Rhode Island v. Innis, 446 U.S. 291 (1980), and Pennsylvania v. Muniz, 496 U.S. 582, 601-02 (1990).  Velazquez argues that the Appellate Division's decision "was contrary to, or, at least, an unreasonable application of, clearly established Supreme Court law, which prohibits the police from engaging in any practice that the police should know is reasonably likely to elicit an incriminating response after a

suspect has invoked his right to remain silent." (Pet. Mem., p. 21, point heading.) I recommend that Judge McMahon deny Velazquez's petition.

## FACTUAL AND PROCEDURAL BACKGROUND

### The suppression hearing

Justice Renee White held a suppression hearing, attended by Velazquez and his attorney. (H. 1-40.) The only witness at the hearing was Detective Richard Serrentino. (H. 3-34.) At H. 36, Justice White stated that she found "this Detective to be a very credible witness." Detective Serrentino's hearing testimony was as follows:

On March 16, 2001, Serrentino interviewed Maria Andrades, who said that Velazquez had "committed some burglaries" and that some of the stolen property was located at 427 St. Ann's Avenue, Apartment 3B, where she and Velazquez lived. (H. 30-32.) She gave Serrentino one of the stolen items, a gold Gucci watch. Serrentino located Velazquez, arrested him, brought him to the station house, and recited the *Miranda* warnings. Velazquez said that he "didn't want to speak" and he refused to waive his rights. (H. 6-8, 18.)

Detectives Serrentino and Clancy searched Velazquez's overcoat and other clothing for "any property that we had to voucher for safekeeping or evidence." (H. 8-9.) They recovered various items, including several pieces of women's jewelry. Serrentino asked, "Whose is all this?" Velazquez said: "I got that jewelry two weeks ago. I bought it off a guy on the street." (H. 10-11; at H. 26, the prosecutor Jeanne Olivo noted that she was not seeking to use this statement on her direct case, because the question was "at the very least [likely?] to elicit an incriminating response.")

Serrentino then began to fill out an "on-line booking sheet," used to gather pedigree information from an arrested person. (H. 12.) Velazquez's wallet contained his New York State photo identification card; it listed an address at 137th Street in the Bronx. (H. 22.) This information was in conflict with the address given to Serrentino a few hours earlier by Andrades. (H. 33-34.) Accordingly, Serrentino asked Velazquez, in words or substance: "Where do you live?"

> Q. And when you asked him that question, for what purpose did you ask him that question?
> A. For clarification. Where does he live,

-3-

what's going on here. . . .
     Q.  Can you please tell the Court what the
defendant said when you asked him where he lived?
     A.  He told me they [that he?] rented a room
with his wife, and that they live on 427 Saint Ann's
Avenue, apartment 3B.
     Q.  Did he tell you what county that was in?
     A.  That's in the Bronx.

(H. 33-34, H. 13.)  Detective Serrentino asked Velazquez why the
address listed on his identification card said 137th Street;
Velazquez replied that his wife's parents lived there.  (H. 23.)
Nevertheless, on the booking form, Serrentino listed only the
137th Street address; he testified that he did so because the
137th Street address was the only address supported by a
document.  (H. 22-23.)

At H. 26-27, the prosecutor handed the judge copies of
*People v. Espinal*, 262 A.D.2d 245 (1st Dept. 1999); *People v.
Maerling*, 64 N.Y.2d 134 (1984); and *People v. Rodney*, 85 N.Y.2d
289 (1995).  The prosecutor said that "pedigree ... statements
are taken for administrative purpose, they are not taken to get
inculpatory information."  (H. 27.)  Defense counsel then cross-
examined the detective about his purpose, and then argued:
"[T]he question as to his particular address is one which clearly
could result in eliciting an incriminating response.  It ... does
not serve the sole purpose of providing pedigree information in
this particular instance, ...."  (H. 35.)  Justice White,
impliedly though not explicitly, found that the address question
was not asked for the purpose of eliciting an incriminating
response, and that it was a permissible question even though the
Detective saw an address on the identification card in
Velazquez's wallet; she said:  "[T]he Detective was filling out
his on-line booking sheet, ... and the Detective asked him to
clarify that information, that's when the defendant gave his
address.  ...  [T]he line of cases indicates that it would be
admissible information ...."  (H. 37-38.)

<u>The trial</u>

The District Attorney's Office made efforts to have Maria
Andrades be a trial witness, but was unable to locate her.  (Tr.
308, 628-29.)

Detective Serrentino testified to the jury as follows.
Maria Andrades contacted the police on March 16, 2001.  On the
same day, Serrentino interviewed her and she gave him a gold
Gucci watch.  (Tr. 433.)  He then located and arrested Velazquez;

he searched Velazquez's pockets, and recovered several bracelets, a chain with the name "Lauren," and a Visor Palm Pilot. (Tr. 438-39.) Serrentino made calls on the Palm Pilot and quickly located its owner, who identified the "Lauren" chain as hers.

During the arrest processing, he asked Velazquez where he lived. Velazquez replied, in sum, that he rented a room with his common-law wife Maria Andrades, and that he lived at 427 St. Ann's Avenue in apartment 3B. (Serrentino's direct testimony on this, Tr. 435-36, is quoted at page 2 of today's Report; on cross-examination, Tr. 483-85, Serrentino conceded that he never wrote down that Velazquez said that he lived at 427 St. Ann's.)

Several hours later, Serrentino obtained a warrant to search apartment 3B at 427 St. Ann's Avenue, where he recovered more jewelry, a jewelry box, a purse, a suitcase and a pair of boots. (Tr. 462-67.) (At trial, these items were identified by their owners as items stolen from two Manhattan apartments.)

Lauren S. (Tr. 201-77) and her two roommates (Tr. 277-99; 353-74) told the jury that their apartment at 415 West 52nd Street was entered on March 15, 2001 in their absence. By 6:00 P.M., numerous items were missing, including the Visor Palm Pilot and the "Lauren" chain (both of which were found one day later in Velazquez's pockets).

The jury also heard testimony from two women (a Ms. Kim and a Ms. Cho) who had resided in an apartment at 950 Columbus Avenue. (Tr. 312-51; 521-50.) They testified that someone entered their apartment on February 22, 2001 and stole many items, including a gold Gucci watch, a Ferragamo purse, and a Samsonite suitcase. The next morning, Ms. Cho reported the burglary to the police and to the management company. (Tr. 539-40.)

The building at 950 Columbus Avenue was equipped with a video surveillance system at the main entrance. (Tr. 399.) On February 23, 2001, in the presence of two police officers (Tr. 373-94) and the building's property manager (Tr. 394-421), Ms. Cho watched a replay of the surveillance video of February 22, 2001. (Tr. 379.) On the video, a man could be seen entering the building at 5:34 P.M. carrying nothing, and leaving at 5:47 P.M. with a purse and a suitcase. (Tr. 384.) The suitcase, of course, was suitable for carrying other items.

The jury saw the videotape and also several still photographs made from the videotape. (*See* Tr. 339, 392, 429-32.) Looking at the still photographs, Ms. Kim was able to testify

that the man was carrying a purse that looked like her purse and a suitcase that looked like her mother's suitcase. (Tr. 345.) The jury was able to compare Velazquez with the man in the video.

At trial, Ms. Kim recognized several of the items seized from the St. Ann's apartment on March 17, 2001, including her purse and her mother's suitcase. (Tr. 337, 340-42.) Ms. Cho identified as hers the gold Gucci watch that the detective had received from Andrades on March 16, 2001. (Tr. 544-45.)

<u>The verdict and sentence</u>

On May 16, 2002, the jury found Velazquez not guilty on one of the two burglary counts (the count relating to 415 West 52nd Street). The jury found him guilty of burglary at 950 Columbus Avenue, and guilty of all three counts of criminal possession, (Count Three concerned the property of Lauren S. of 415 West 52nd Street; Counts Four and Five concerned the property of the two residents at 950 Columbus Avenue).

It is true that the defendant's answer to the question about his address tied him to the stolen property found at that address (427 St. Ann's Avenue). However, the recovery of recently stolen property was not persuasive to this jury when it deliberated on the two burglary counts (which were the only felony counts). Defense counsel's opening statement (at Tr. 199) had told the jury there was no dispute that the two burglaries had occurred, and in particular that "[o]n March 15, 2001, ... an apartment was burglarized at 415 West 52nd Street, that being apartment 4A." And his summation (see Tr. 645) conceded that, one day later, the defendant's pockets contained the Palm Pilot of a resident of that apartment. Nevertheless, the jury found that this evidence established only misdemeanor possession, and did not establish that defendant was guilty of the burglary at the 52nd Street apartment. (The jury did find the defendant guilty of the February 22, 2001 burglary at 950 Columbus Avenue, evidently because of the surveillance video.)

On June 26, 2002, Velazquez was sentenced as a persistent violent felony offender. His lengthy criminal record is described at Exh. C, pp. 56-57, 59-60 (8 prior felonies). He received 16 years to life on the burglary count. He received concurrent one-year prison terms on the stolen property counts.

<u>The direct appeal</u>

Legal Aid took until September 2005 to file its appellate brief (Exh. A). Part of that delay was apparently caused by the fact that the Appellate Division took about ten months to grant poor-person status. (*See* Exh. A, p. 1.) On October 5, 2006, the Appellate Division wrote a fairly long opinion. It said in part:

> Defendant's motion to suppress his statement that he lived with his wife at 427 St. Ann's Avenue properly was denied under the "pedigree exception," pursuant to which answers to questions reasonably related to police administrative concerns fall outside the protections of *Miranda v. Arizona,* 384 U.S. 436 (1966) (*see Pennsylvania v. Muniz*, 496 U.S. 582, 601-02 (1990); *People v. Rodney*, 85 N.Y.2d 289, 292-93 (1995)). In *Rhode Island v. Innis* (446 U.S. 291 (1980)), the Supreme Court defined interrogation to "extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response" (*id.* at 302). However, a question which falls within the scope of interrogation under *Rhode Island v. Innis* does not for that reason fall outside the pedigree exception. As the People correctly argue, a contrary conclusion would preclude, for example, any pedigree questions relating to a suspect's physical features whenever a crime victim gave a description of the perpetrator to the police.
>
> Thus, in *People v. Rodney*, the Court emphasized that the pedigree question at issue "was not a disguised attempt at an investigatory interrogation" (85 N.Y.2d at 294), and cited cases in which questions eliciting information bearing directly on an essential element of the crime charged were held to fall outside the pedigree exception (*id.* at 293). Here, the address question is unquestionably a proper and standard subject of pedigree inquiry; the detective's contemporaneous conduct of entering the 137th Street address into the online booking sheet stands as persuasive evidence that the question "was not a disguised attempt at an investigatory interrogation"; and defendant's address has no necessary connection to an essential element of the crimes charged. . . .

Exh. D; *People v. Velazquez,* 33 A.D.3d 352, 353-54, 822 N.Y.S.2d 65, 67 (1st Dept. 2006).

<u>DISCUSSION OF VELAZQUEZ'S PETITION</u>

28 U.S.C. § 2254(d) provides that an application for a writ of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in the State court unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Velazquez points to subdivision (1). Hence, he must show that the state court (a) "arrive[d] at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or (b) "decide[d] [the] case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous;" it must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

In essence, Velazquez asserts the following proposition of law: If an arrestee has told the police that he does not want to speak, and if it is reasonably likely that stating his address might tend to incriminate him, then the police are not permitted to ask him to state his address (or, if they are permitted to ask, then they must not reveal the answer to a jury). Velazquez claims that this proposition was "clearly established" in the *Innis* decision. However, *Innis* did not deal with asking an arrestee for his address, and did not even deal with asking a question. Instead, *Innis* dealt with two policemen talking to each other, in Innis's presence, about a missing shotgun ("there's a lot of handicapped children running around in this area, and God forbid one of them might find a weapon with shells"); Innis responded that he would show them where the gun was located. The Supreme Court said:

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say ... any words or actions on the part of the police (**other than those normally attendant to arrest**

**and custody**) that the police should know are
reasonably likely to elicit an incriminating
response from the suspect.

*Innis*, 446 U.S. at 300-01 (emphasis added).

Six years later, the Second Circuit decided *United States v.
Gotchis*, 803 F.2d 74 (2d Cir. 1986). A DEA agent arrested
Gotchis, who received the *Miranda* warnings and said that he did
not wish to answer questions. The DEA agent then asked for "his
date of birth, address, and telephone number, ... [and] what he
did for a living." Gotchis's answer to the last question turned
out to be incriminating. The Second Circuit ruled that his
answer was admissible, and it wrote:

> ... Routine questions about a suspect's
> identity and marital status, ordinarily
> innocent of any investigative purpose, do not
> pose the dangers *Miranda* was designed to check;
> they are rather the sort of questions "normally
> attendant to arrest and custody," *see Rhode Island
> v. Innis*, 446 U.S. 291, 301 (1980), .... It is
> true, as Gotchis argues, that lack of employment
> may evince intent to distribute [narcotics] in
> a particular case. But ... procurement of
> employment data would in most cases be as
> innocent and as useful for purposes of booking
> and arraignment as procurement of data about a
> suspect's marital status ....

*Gotchis*, 803 F.2d at 79.

In 1990, the Supreme Court decided *Pennsylvania v. Muniz*,
496 U.S. 582 (1990). Muniz was arrested for driving while
intoxicated. Without advising him of his *Miranda* rights, the
police asked Muniz, on videotape, "his name, address, height,
weight, eye color, date of birth, and current age. He responded
to each of these questions, stumbling over his address and age.
The officer then asked Muniz, 'Do you know what the date was of
your sixth birthday?'" A state appellate court ruled that the
audio portion of the videotape should have been suppressed in its
entirety. The Supreme Court, by a vote of 8 to 1, reversed as to
the seven questions about his name, address, height, weight, eye
color, date of birth, and current age. Justices Brennan,
O'Connor, Scalia, and Kennedy concluded:

> ... [T]hese first seven questions ...
> fall within a "routine booking question"

exception which exempts from *Miranda*'s coverage
questions to secure the "'biographical data
necessary to complete booking or pretrial
services.'" .... [FN 14:] As *amicus* United
States explains, "[r]ecognizing a 'booking
exception' to *Miranda* does not mean, of course,
that any question asked during the booking process
falls within that exception.  Without obtaining
a waiver of the suspect's *Miranda* rights, the
police may not ask questions, even during booking,
that are **designed** to elicit incriminating
admissions."

*Muniz*, 496 U.S. at 601-02 and n. 14 (Justice Brennan's opinion
for four Justices) (emphasis added).  I note that the word
"designed" requires a showing of deliberate police "design"
rather than the negligence test that Velazquez wishes to import
from *Innis*, namely "words or actions on the part of the police
(other than those normally attendant to arrest and custody) that
the police **should know** are reasonably likely to elicit an
incriminating response."   (Emphasis added.)

In *Muniz*, four other Justices (Rehnquist, White, Blackmun,
and Stevens) concluded that "the seven 'booking' questions should
not be suppressed" regardless of any consideration about the
intentions of the police:

        ... Muniz's responses to the videotaped
    "booking" questions were not testimonial and
    do not warrant application of the privilege.
    Thus, it is unnecessary to determine whether
    the questions fall within [a] "routine booking
    question" exception to *Miranda* ....

*Muniz*, 496 U.S. at 606, 608.

In *Muniz*, only one Justice read *Innis* to govern a question
asking an arrestee to state his address.  That was Justice
Marshall, who wrote:  "I disagree ... with Justice BRENNAN's
recognition ... of a 'routine booking question' exception to
*Miranda*.  Moreover, even were such an exception warranted, it
should not extend to booking questions that the police should
know are reasonably likely to elicit incriminating responses."
*Muniz,* 496 U.S. at 608-09 (dissent).

The "routine booking question" exception had been previously
recognized by the New York Court of Appeals and the Second
Circuit, and they reaffirmed it in *People v. Rodney*, 85 N.Y.2d

-10-

289 (1995), and *Rosa v. McCray*, 396 F.3d 210 (2d Cir. 2005).
*Rodney* said "the People may not rely on the pedigree exception if
the questions, though facially appropriate, are likely to elicit
incriminating admissions," and then cited footnote 14 of *Muniz*,
and page 301 of *Innis*, and a 1970 state case which (unlike *Innis*)
involved a booking question and ruled that it was "neither
intended nor likely to elicit information of a criminal nature."
*People v. Rivera*, 26 N.Y.2d 304, 309 (1970).  But *Rodney*'s next
paragraph gave two formulations, one similar to the willfulness
language in *Muniz* ("not a disguised attempt") and one similar to
the negligence language in *Innis* ("not reasonably likely").  As
far as I have seen, the New York Court of Appeals and the Second
Circuit have not actually used the negligence test to suppress an
answer to a booking question.

   In *Rosa*, a robbery victim told two detectives "that the
robber ... had brown hair, with the ends slightly lighter."  One
day later, she spotted Rosa and recognized him as the robber
"despite his hair being a different color (blonde) than that of
her assailant (brown)."  Rosa was arrested.  The same two
detectives handled the booking; without giving *Miranda* warnings,
one of them asked Rosa:  "What is your real hair color?"  396
F.3d at 213.  Judge Motley granted habeas, but the Second Circuit
(2 to 1) reversed.  In a passage pertinent to the case at bar,
the Second Circuit wrote:

          ... [T]he booking questions were presented
     to Rosa in the exact order that the questions
     appeared on the booking form ....  Moreover,
     if the officer perceives - - either through
     direct observation or otherwise - - that a
     specific piece of information provided by the
     arrestee is patently incorrect, then it is
     not only reasonable, but arguably the officer's
     duty, to inquire further.

          We hold that [Detective] Arroyo was engaged
     in a booking process that was reasonably related
     to police administrative concerns.  But of course
     "recognizing a booking exception to *Miranda* does
     not mean ... that any question asked during the
     booking process falls within that exception.
     Without obtaining a waiver of the suspect's
     *Miranda* rights, the police may not ask questions,
     even during booking, that are **designed** to elicit
     incriminatory admissions."  *Muniz*, 496 U.S. at
     602, n. 14, ....

*Rosa*, 396 F.3d at 221-22 (with my emphasis).

The next paragraph should probably be viewed as dictum, since the issue was whether the Appellate Division's decision in *Rosa* "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court." That paragraph began: "To determine whether the police abused the gathering of pedigree information in a manner that compels *Miranda* protection requires an objective inquiry: Should the police have known that asking the pedigree questions would elicit incriminating information? *See Innis*, ...." *Rosa*, 396 F.3d at 222.

In the case at bar, *Rodney* and *Rosa* were cited to the Appellate Division in the State's brief (Exh. C, pp. 28-33). In affirming Velazquez's conviction, the Appellate Division quoted the negligence language from *Innis* but essentially held that a pedigree question is governed by a willfulness standard -- namely, whether the question was "a disguised attempt at an investigatory interrogation," a formulation similar to the one in footnote 14 of *Muniz* ("designed to elicit incriminatory admissions"). By contrast, *Rodney* and *Rosa* were each somewhat ambiguous as to whether a pedigree question should be governed by a standard of negligence or willfulness. However, 28 U.S.C. §2254 does not call for us to check the Appellate Division for congruence with opinions of the New York Court of Appeals or the Second Circuit; the question for us is whether the Appellate Division's decision was an "unreasonable application" of "clearly established Federal law, as determined by the Supreme Court of the United States."

In deciding that question, we are guided by *Yarborough v. Alvarado*, 541 U.S. 652, 660, 664 (2004):

> ... For purposes of 28 U.S.C. §2254(d)(1), clearly established law as determined by this Court "refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision." ...

> *       *       *

> ... [T]he range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. ... Other rules are more general, and their meaning must emerge in application over the course of time. ... The more general

the rule, the more leeway courts have in reaching outcomes in case-by-case determination. ...

The rule in *Innis* (as read by Velazquez) is a very general one.  But *Innis* did not involve a booking question, and it specifically excluded police "words or actions" that are "normally attendant to arrest and custody."  Ten years later, the Supreme Court decided *Muniz*, which involved seven booking questions - - questions about the arrestee's pedigree, including a question asking for his address; eight Justices reversed the suppression of those questions, with four Justices recognizing a "routine booking question" exception to *Miranda*, and the other four finding it "unnecessary to determine whether the [seven] questions fall within [a] 'routine booking question' exception."

Let us now focus on the portion of the Appellate Division decision that Velazquez asserts to be an unreasonable application of *Innis*:

> ... In *Rhode Island v. Innis* (446 U.S. 291 (1980)), the Supreme Court defined interrogation to "extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response" (*id.* at 302).  However, a question which falls within the scope of interrogation under *Rhode Island v. Innis* does not for that reason fall outside the pedigree exception.  As the People correctly argue, a contrary conclusion would preclude, for example, any pedigree questions relating to a suspect's physical features whenever a crime victim gave a description of the perpetrator to the police.

> ... Here, the address question is unquestionably a proper and standard subject of pedigree inquiry; the detective's contemporaneous conduct of entering the 137th Street address into the online booking sheet stands as persuasive evidence that the question "was not a disguised attempt at an investigatory interrogation"; ....

Exh. D; *People v. Velazquez,* 33 A.D.3d 352, 353-54, 822 N.Y.S.2d 65, 67 (1st Dept. 2006).

The last nine words were quoting a portion of *People v. Rodney* that used a formulation similar to the one in Justice Brennan's footnote 14 in *Muniz* ("designed to elicit incriminatory admissions").  Velazquez argues that the Appellate Division was

unreasonable when it failed to use the negligence test contained in *Innis*.  The short answer is to read what *Innis* said:

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.  That is to say ... any words or actions on the part of the police (**other than those normally attendant to arrest and custody**) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Innis*, 446 U.S. at 300-01 (emphasis added).  Velazquez's reply memorandum, at page 4, harmlessly misquotes from this passage but unpersuasively argues:

> While the *Innis* Court excepted "words or actions routinely attendant to arrest and custody" from its definition of interrogation, **the only logical interpretation of this** is that un-*Mirandized* routine pedigree questioning is permitted because, ordinarily, such questions are not reasonably likely to elicit an incriminating response. [Emphasis added]

This sounds as if Velazquez is arguing that the Supreme Court engaged in meaningless surplusage when it wrote the phrase "other than those normally attendant to arrest and custody."  Or perhaps his interpretation of *Innis* is that *Miranda* applies with full rigor to answers to pedigree "questions," but a negligence test governs responses to pedigree "words."

In any event, Velazquez's interpretation is not the only logical or reasonable interpretation.  In this connection, I note Judge Lynch's concurring opinion in *Nicholas v. Goord*, 430 F.3d 652, 680 (2d Cir. 2005):

> ...  Although arrested persons may not ordinarily be interrogated without being given *Miranda* warnings, questions aimed at eliciting identifying or "pedigree" information [are] permitted without warnings, even though the answers to such questions may become evidence either of the particular crime for which the suspect was arrested, or of some past or future crime not yet under investigation.

I also note *United States v. Haygood,* 157 Fed. Appx. 448, 449 (2d Cir. 2005), which involved facts similar to the case at bar.

"Defendant was arrested by Bridgeport police officers who observed him during an apparent drug sale."  "[A] police informant who witnessed the arrest ... gave police defendant's address."  While booking the defendant, and without giving *Miranda* warnings, the police asked for his address.  The officers then obtained a warrant to search that address, where they found crack cocaine.  He pleaded guilty but challenged the search on the ground of his *Miranda* rights.  The Second Circuit rejected that challenge.  In dictum, it made clear that his statement of his address could have been used against him if he had gone to trial:  "Additionally, it is well-settled that routine booking questions do not constitute interrogation protected by *Miranda*."

Finally, Velazquez suggests that the Appellate Division was unreasonable when it found that the address question "was not a disguised attempt at an investigatory interrogation."  His reply memorandum, at page 8 argues (with my emphasis added):

> In any event, even if *Muniz* were "clearly
> established law," the [address] question here
> was entitled to *Miranda* protection under *Muniz*
> because it was **intended** to elicit an incriminating
> respons.  The police officer himself testified
> that he was trying to "clarify" at which address
> petitioner lived - - the address on petitioner's
> identification card or the address where [according
> to the wife] the stolen property was located - -
> the St. Ann's address.  What is more, the police
> officer did not treat the St. Ann's address as
> booking information because he did not record
> that address on the booking sheet.

In my view, the Appellate Division reasonably found that the address question was not a deliberate "disguised attempt at an investigatory interrogation" (or, to use the language in *Muniz*, a question "designed to elicit incriminatory admissions").  At the suppression hearing, the detective testified that he recorded the 137th Street address because that was the only address supported by a document.  (H. 22-23.)  It is a reasonable inference that he did not anticipate using Velazquez's answer at a trial; later, it turned out that the wife was unavailable to testify.  (Tr. 308, 628-30.)

## CONCLUSION AND RECOMMENDATION

For the reasons set forth above, I recommend that Judge McMahon deny Velazquez's habeas corpus petition.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, any party may object to this recommendation within 10 business days after being served with a copy (i.e., no later than **October 24, 2008**), by mailing written objections to the Clerk of the U.S. District Court and mailing copies (a) to the opposing party, (b) to the Honorable Colleen McMahon, U.S.D.J., at Room 640, 500 Pearl Street, New York, NY 10007 and (c) to me at Room 1360, 500 Pearl Street, New York, NY 10007. Failure to file objections within 10 business days will preclude appellate review. *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. Rules 72, 6(a), and 6(d). Any request for an extension of time must be addressed to Judge McMahon.

 

 

 

 

                                         _____

DOUGLAS F. EATON
United States Magistrate Judge
U.S. Courthouse
500 Pearl Street, Room 1360
New York, NY 10007

Dated:    New York, New York
          October 6, 2008

Copies of this Report and Recommendation are being mailed to:

Roberto Velazquez, DIN # 02A3920
Coxsackie Correctional Facility
P.O. Box 200
West Coxsackie, N.Y. 12051

Frances A. Gallagher, Esq.
The Legal Aid Society
199 Water Street - - 5th Floor
New York, NY 10038

Ashlyn Dannelly, Esq.
Assistant Attorney General
State of New York
120 Broadway
New York, NY 10271-0332

Hon. Colleen McMahon

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, any party may object to this recommendation within 10 business days after being served with a copy (i.e., no later than **October 24, 2008**), by mailing written objections to the Clerk of the U.S. District Court and mailing copies (a) to the opposing party, (b) to the Honorable Colleen McMahon, U.S.D.J., at Room 640, 500 Pearl Street, New York, NY 10007 and (c) to me at Room 1360, 500 Pearl Street, New York, NY 10007. Failure to file objections within 10 business days will preclude appellate review. *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. Rules 72, 6(a), and 6(d). Any request for an extension of time must be addressed to Judge McMahon.

*Douglas F. Eaton*

DOUGLAS F. EATON
United States Magistrate Judge
U.S. Courthouse
500 Pearl Street, Room 1360
New York, NY 10007

Dated:     New York, New York
           October 6, 2008

Copies of this Report and Recommendation are being mailed to:

Roberto Velazquez, DIN # 02A3920
Coxsackie Correctional Facility
P.O. Box 200
West Coxsackie, N.Y. 12051

Frances A. Gallagher, Esq.
The Legal Aid Society
199 Water Street - - 5th Floor
New York, NY 10038

Ashlyn Dannelly, Esq.
Assistant Attorney General
State of New York
120 Broadway
New York, NY 10271-0332

Hon. Colleen McMahon

-16-